<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRAVELODGE HOTELS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HUBER HOTELS, LLC, *et al.*,<br><br>Defendants. | Case No. 2:19-cv-20571 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Plaintiff Travelodge Hotels, Inc.'s ("Travelodge") Complaint ("Complaint") (ECF No. 1) against Defendants Huber Hotels, LLC ("Huber Hotels"), Robert Huber ("Mr. Huber"), and Janette Huber ("Mrs. Huber") (collectively, "Defendants"). This action relates to a franchise agreement ("Agreement") between the parties for the operation of a hotel in Hurley, Wisconsin.

The Court held a two-day bench trial on April 8 and 9, 2025. The parties submitted pre-trial proposed findings of fact and conclusions of law on April 1, 2025. (ECF Nos. 102–03.) On May 30, 2025, the parties submitted responsive post-trial briefings and final proposed findings of fact and conclusions of law.[1] (ECF Nos. 109–10.)

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The findings of fact are based on the Court's observations and credibility determinations of the witnesses who testified and a thorough

---

[1] The parties were very well served and represented by their attorneys. As stated on the record at the close of trial on April 9, 2025, the Court noted and praised the attorneys' "legal ability, their oral presentation, oral argument, written submissions, and most importantly, civility toward the Court and to each other." (Tr. 211:17–24.)

review of all the evidence admitted at trial. For the reasons set forth below, and for good cause having been shown, the Court finds in favor of Defendants.

## I.    BACKGROUND

This action arises out of a contract dispute between Travelodge as the franchisor, Huber Hotels as the franchisee, and Mr. and Mrs. Huber as the principal members of Huber Hotels. (ECF No. 1 (Compl.) ¶¶ 1–4.) Travelodge is a corporation operating a guest lodging facility franchise system with its principal place of business in Parsippany, New Jersey. (*Id.* ¶ 1.) Mr. and Mrs. Huber are co-owners of Huber Hotels, a limited liability company operating out of Hales Corner, Wisconsin. (*Id.* ¶¶ 1–4.) Mr. and Mrs. Huber organized Huber Hotels for the purpose of acquiring and operating a hotel in Hurley, Wisconsin, which is the subject of this case. (*Id.*)

### A.  The Franchise Agreement

On or about November 10, 2017, Travelodge entered into the Agreement with Defendants for the operation of a 99-room guest lodging facility located at 1000 10th Avenue North, Hurley, Wisconsin 54534, referred to the "Facility," as a Travelodge franchise. (Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law (ECF No. 110) ¶ 7.) Defendants were obligated to operate the Facility for a fifteen-year-term. (*Id.*) In September 2017, Mr. and Mrs. Huber applied to become a Travelodge franchise, and on October 12, 2017, Travelodge provided them with a Franchise Disclosure Document ("FDD") outlining information about and requirements of a franchise relationship with Travelodge. (*Id.* ¶ 3–4.) Travelodge inspected the Facility in September 2017 and generated a Property Improvement Plan with a list ("punch list") of improvements to and repairs of the Facility that Defendants would be required to complete before the Facility could be approved to open as a Travelodge franchise. (*Id.* ¶¶ 8–9.)

On November 2, 2017, Mr. and Mrs. Huber executed the Property Improvement Plan.[2] (*Id.* ¶ 10.) Pursuant to Sections 7 and 18.1 and Schedule C of the Agreement, Defendants were required to make periodic payments to Travelodge for royalties, system assessments, taxes, interest, SynXis fees, and other fees (collectively, "recurring fees"). (*Id.* ¶ 17.) In Section 7.3 of the Agreement, Defendants agreed that interest is payable "on any past due amount payable to Travelodge under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid." (*Id.* ¶ 22.) Defendants were required to prepare and submit monthly reports to Travelodge disclosing gross room revenue earned by Huber Hotels at the Facility, and they agreed to maintain accurate financial information relating to the gross room revenue at the Facility; to allow Travelodge to examine, audit, and make copies of the financial information; and not to lease the Facility or engage in any change, assignment, transfer, conveyance, or pledge of its interest except with Travelodge's prior written consent pursuant to Sections 3.6 and 9 of the Agreement. (*Id.* ¶¶ 23–24.) Any attempted transfer, conveyance, or pledge would be void and would give Travelodge the right to terminate the Agreement. (*Id.* ¶ 25.)

Additionally, Section 11.2 of the Agreement provided Travelodge could terminate the Agreement without notice to Defendants if they (1) discontinued operating the Facility as a Travelodge guest lodging establishment, and/or (2) lost possession or the right to its possession. (*Id.* ¶ 26.) Pursuant to Sections 12.1 and 17.4 of the Agreement, Defendants agreed to pay liquidated damages to Travelodge in accordance with a formula specified in the Agreement within thirty days of a termination, and that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees incurred by the prevailing party to enforce this

---

[2] On or about November 10, 2017, Travelodge and Mr. and Mrs. Huber entered into a SynXis Subscription Agreement, which governed Defendants' access to and use of certain Travelodge computer programs, applications, features, and services, and all modifications, corrections, updates, and enhancements to the same. (ECF No. 110 ¶ 14.)

Agreement or collect amounts owed under this Agreement." (*Id.* ¶¶ 27, 30.) Mr. and Mrs. Huber provided Travelodge with a Guaranty Agreement ("Guaranty") of Huber Hotels' obligations, under which they agreed to "immediately make each payment and perform or cause Huber Hotels to perform, each unpaid or unperformed obligation of [Huber Hotels] under the Agreement" upon default, as well as pay the costs, including reasonable attorneys' fees, incurred by Travelodge in enforcing its rights or remedies under the Guaranty or the Agreement. (*Id.* ¶ 36.)

**B. Performance and Termination of the Agreement**

Mr. and Mrs. Huber allege the parties agreed to an opening date of January 29, 2018, and expected the Facility would be integrated into Travelodge's reservation system on the same day. (Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law (ECF No. 109) ¶¶ 14–15.) They further allege Travelodge failed to send a representative or call in advance to cancel the installation scheduled for January, and instead were told it was being delayed to mid-March 2018. (*Id.* ¶ 16.) Mr. and Mrs. Huber contend a Travelodge representative later apologized and made commitments to move forward with an opening in May 2018. (*Id.* ¶ 19.) Travelodge alleges the opening date for the Facility was May 16, 2018, and on that day, it provided Defendants with access to its central reservation system. (ECF Nos. 110 ¶¶ 37–38; 109 ¶ 21.) However, Mr. and Mrs. Huber allege the Facility had not been properly integrated into the reservation system on that day. (ECF No. 109 ¶ 22.) They contend the Travelodge website entry published for the Facility had numerous deficiencies, including: (1) only one photograph of the front of the hotel but none of the lobby area or room interiors; (2) an incorrect address and phone number; and (3) directions that, as listed, led to the middle of a forest approximately three miles away from the Facility location. (*Id.* ¶ 24.) Mr. and Mrs. Huber contacted Travelodge regarding these issues, but none were resolved through at least June 10, 2018. (*Id.* ¶ 25.) On that day, Defendants sold the Facility back to Paul Bertelson

("Bertelson"), the land contract vendor from whom they purchased it, because they could no longer afford to pay $30,000 per month in operating expenses. (*Id.* ¶¶ 25–27.) Mr. and Mrs. Huber contend they believed Bertelson was favorably disposed toward continuing the Facility as a Travelodge hotel. (*Id.* ¶ 27.) Following alleged negotiations between Travelodge and Bertelson regarding Bertelson's continuing to franchise the Facility, Bertelson ultimately declined, and Travelodge sent him a letter on July 18, 2018, demanding that he cease operating the Facility as a Travelodge. (*Id.* ¶ 28.) On July 16, 2018, Travelodge sent a Notice of Termination to Defendants retroactively terminating the Agreement effective June 18, 2018, the date the Facility was quit-claimed to Bertelson. (*Id.*)

Travelodge asserts Defendants caused delays in the opening of the Facility when they failed to: (1) complete the items marked "prior to opening" on the punch list; (2) timely provide items requested by Travelodge that were necessary to install the property management system; (3) provide a "Data Pack" (a list of important information about the hotel including room details and property amenities) in a timely manner; (4) timely install a new phone system; and (5) advise Travelodge in March 2018 that the Facility would be shut down until May 2018. (ECF No. 110 ¶ 39.) Travelodge further alleges it provided Defendants the right to use the Travelodge trade name, trademarks, and service marks, as well as access to the Travelodge reservation system. (*Id.* ¶ 42–43.) Travelodge claims Defendants failed to pay recurring fees. (*Id.* ¶ 45.)

In response, Mr. and Mrs. Huber allege they made substantial renovations to the Facility, including refurbishing the lobby area with new carpeting, furniture, and fireplaces and installing new mattresses and furnishings in guest rooms. (ECF No. 109 ¶ 13.) They contend they were not delinquent under the Agreement, and Travelodge terminated the Agreement for no reason other than the conveyance of the Facility. (*Id.* ¶ 28.) They further allege Travelodge failed to integrate the Facility into its reservation system within a reasonable time, and they reached a point at which they could no longer sustain the business of the Facility. (*Id.* ¶ 32.)

Defendants also contend Travelodge did not give them prior written notice of its termination or an opportunity to cure any alleged default. (*Id.* ¶ 30.)

### C. Travelodge's Allegations

Travelodge initiated this lawsuit alleging breach of contract. (ECF No. 1.) Travelodge alleges Defendants' failure to pay gross room revenue, unilateral termination of the Agreement by quit-claiming the Facility to Bertelson, and refusal to pay liquidated damages as a result of the termination caused it to sustain a loss of future revenue over the remaining fifteen-year term of the Agreement. (*Id.* ¶¶ 24–25.) Specifically, the Complaint alleges Defendants failed to allow Travelodge to examine, audit, and make copies of Huber Hotels' financial information, and demands judgment ordering it to account for any and all revenue derived under the Agreement from its inception through termination. (*Id.* ¶¶ 26–29.) Travelodge also contends Defendants failed to pay recurring fees owed under the Agreement, in the amount of $62,579.66, together with interest, attorneys' fees, and costs of suit, resulting in their unjust enrichment. (*Id.* ¶¶ 41–44, 45–48.) Additionally, it alleges Mr. and Mrs. Huber failed to make any of the above-mentioned payments or perform, or cause Huber Hotels to perform, each obligation under the Agreement, and are therefore liable for all liquidated damages totaling $198,000.00 (with interest, attorneys' fees, and costs of suit), or actual damages to be determined at trial, and recurring fees due and owing under the Agreement totaling $62,579.96. (*Id.* ¶¶ 30–40, 49–52.)

### D. Defendants' Defenses

Mr. and Mrs. Huber allege Travelodge materially breached the Agreement by failing to integrate the Facility into its reservation system within a reasonable time, thereby excusing them from any further performance under the Agreement. (ECF No. 109 ¶¶ 33–34.) They further allege Travelodge failed to prove its performance and entitlement to damages and failed to comply with Wis. Stat. § 135.04, rendering its termination of the Agreement unlawful. (*Id.*

¶¶ 37–38.) Consequently, Defendants assert Travelodge cannot claim default on the part of Huber Hotels or an entitlement to liquidated damages. (*Id.* ¶ 38.) Lastly, Defendants believe Travelodge's claim for liquidated damages fails because it is unreasonable and amounts to an unlawful penalty, and argue they are entitled to recover litigation expenses. (*Id.* ¶¶ 39–40.)

### E.  Procedural History

Travelodge initiated this lawsuit alleging breach of contract on November 21, 2019. (*See generally* ECF No. 1.) On January 27, 2020, Defendants filed an Answer raising seventeen affirmative defenses and requesting the Court: (1) dismiss the Complaint with prejudice; (2) find Travelodge may take nothing from Defendants by virtue of said Complaint; (3) grant Defendants an award of taxable costs; and (4) issue a court order with such other and further relief as the Court may find just and proper. (ECF No. 11 at 12.) On March 26, 2021, Defendants filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a), which was terminated without prejudice following a status conference on March 31, 2021. (ECF Nos. 24, 28.) On August 13, 2021, both parties filed summary judgment motions (the "Motions"). (ECF Nos. 37, 38.) On September 3, 2021, Travelodge (ECF No. 39) and Defendants (ECF No. 40) filed opposition briefs to the other's Motion. Travelodge filed a responsive brief in support of its Motion on September 13, 2021. (ECF No. 41.) On the same day, Defendants also filed a response in support of their Motion. (ECF No. 42.) The Court issued an opinion and order denying both Motions on January 5, 2022. (ECF Nos. 43, 44.)

Travelodge filed a joint final proposed pretrial order on May 13, 2022. (ECF No. 54.) Defendants moved for a jury trial under Federal Rule of Civil Procedure 39(b) on January 31, 2023 (ECF No. 73), which Travelodge opposed (ECF No. 76). Defendants filed a responsive brief on March 15, 2023. (ECF No. 77.) The Court denied Defendants' motion for a jury trial under Rule 39(b) on September 27, 2023. (ECF Nos. 85, 86.) On May 22, 2024, Travelodge wrote a letter notifying the Court of the parties' agreement to hold a *de bene esse* deposition of

Mrs. Huber on July 31, 2024. (ECF No. 88.) Travelodge and Defendants each submitted comments regarding objections raised at the *de bene esse* deposition. (ECF Nos. 90, 91.) This Court held a bench trial on April 8, 2025, and April 9, 2025. (ECF Nos. 107, 108.) Travelodge (ECF No. 110) and Defendants (ECF No. 109) both submitted post-trial proposed findings of fact and conclusions of law.

## II.    FINDINGS OF FACT[3]

### A.    Plaintiff's Trial Witnesses[4]

#### 1.    Kendra Mallet

Kendra Mallet ("Mallet") testified on April 8, 2025, and offered testimony relating to the Agreement between the parties. Overall, the Court found Mallet to be a credible witness and accorded her testimony commensurate weight.

As Vice President of Global Franchise Administration at Wyndham Hotel Group, LLC ("Wyndham"), Travelodge's parent company, Mallet testified on the basis of her review of the Travelodge file related to the Huber Hotels franchise as well as the trial exhibits, stating "[she] did not communicate directly with the franchisees themselves." (Trial Transcript ("Tr.") at 5:15–19, 6:13–14, 6:18–23, 33:14–17, 36:4–5.) Her testimony focused on the Agreement with Huber Hotels and the obligations it imposed on Defendants, and she affirmed that Huber Hotels executed the Agreement with Travelodge on November 10, 2017, for a fifteen-year term. (*Id.* at 14:9, 14:16–19; Trial Ex. P1.) She testified the Agreement was terminated on June 18, 2018, after Defendants executed a quit claim deed relinquishing control of the Facility. (*Id.* at 27:8–28:10, 70:16–25; Trial Exs. P5, D8.)

---

[3] To the extent any findings of fact are more appropriately categorized as conclusions of law, and vice versa, they are adopted as such.

[4] The Court's credibility determinations were based not only on a witness's response to a particular question, but also the witness's physical reaction (*i.e.*, body language, facial expressions, furtive movements, shifting, squirming, folding of their arms, etc.).

Mallet explained key provisions of the Agreement, such as the effective date, the duration, the rights granted to Huber Hotels, and the requirements for the Facility to open as a Travelodge hotel. (Tr. at 5:12–99:25.) Specifically, Mallet stated the parties signed the Agreement after Defendants received the FDD and a Property Improvement Plan with an enclosed punch list of required property improvements before the Facility could open as a Travelodge hotel. (*Id.* at 9:1, 14:16–19; Trial Exs. 9, 12.) These improvements included having a Data Pack, connecting door locks between adjoining rooms, and a new telephone system with "a phone in every room." (Tr. at 12:15–19, 19:25–21:2.) Mallet testified that while generally every item marked as prior-to-opening ("PTO") on the list must be completed before a facility may open as a Travelodge hotel (*id.* at 21:3–5), exceptions can be made, and facilities may be permitted to open with less than 100% completion of punch list items (*id.* at 59:21–22). Specifically, Mallet gave the following responses during cross-examination:

> MR. MACHULAK [Defense Counsel]: Do people in the property openings department have authority to cut some slack on [punch list] items?
> MALLET: Decisions can be made based on what they think is then completed based on the punch list completion items.
> MR. MACHULAK: Decisions can be made based upon what?
> MALLET: When the punch list items are completed or in the process of being completed, orders placed and confirmed, there can be decisions made to open the hotel if everything is in order to complete the requirement.
> MR. MACHULAK: Okay. So somebody in that department can say, Okay, you are 90 percent there, let's go ahead and open?
> MALLET: I don't know if that's what happened in this particular case but –
> MR. MACHULAK: I'm just asking generally.
> MALLET: It can. Decisions can be made based on what's been submitted as completed.

(*Id.* at 59:7–22.)

Mallet stated that the time between the signing of the Agreement on November 10, 2017, and the authorized opening as a Travelodge hotel on May 16, 2018, was roughly six months as "[Huber Hotels] work[ed] through the completion of the punch list." (*Id.* at 16:2–3,

17:12–16.) In particular, Mallet commented on communications between Mr. and Mrs. Huber and Cathy Pocci ("Pocci"), Wyndham's Manager of Franchise Integration, and Melissa Hanson ("Hanson"), Wyndham's Director of Hotel Integration, regarding obstacles encountered in the Facility opening process and the completion of PTO items on the punch list. (*Id.* at 18:12–19, 20:9–23, at 33:8–84:5.)[5] Mallet testified Mr. Huber sent an email to Pocci on March 6, 2018, in which he accepted "responsibility that the transition had not been completed," citing the "very, very poor business mode" of the telephones purchased to attempt to satisfy the punch list requirement and noting "[w]e are returning the phones we had purchased and are going to have either AT&T or Spectrum supply and install the phones." (*Id.* at 21:10–22:7; Trial Ex. P10 at 15.) On the other hand, Mallet acknowledged Hanson wrote an email to Selina Panek, General Manager at the Facility, concerning "a situation that had happened throughout the openings process thus far with [Pocci]," and expressed her "sincere[] apolog[y] for any of the heartache that was caused." (*Id.* at 44:1–20.) Further cross-examination revealed the "heartache" to which Hanson was referring related to the planned January 2018 opening for the Facility, which was postponed because Travelodge lacked available personnel to move forward with the on-site property management system installation scheduled for January 29, 2018. (*Id.* at 44:21–46:16.) Mallet also admitted that, despite Travelodge's responsibility for ensuring the address provided by franchisees was listed correctly in its central reservation

---

[5] Mallet's testimony raised questions about the completeness of notes compiled in Salesforce ("Salesforce Notes"), "a technology that [Wyndham] use[s] to capture information about a site and any communications regarding the site[.]" (Tr. at 18:4–6.) Many of the emails to which defense counsel directed her attention during cross-examination (and which were produced to the defense by Plaintiff's counsel) were not found within Plaintiff's trial exhibit labeled "Salesforce Notes[,]" (Tr. at 44:9–45:25 ("MR. MACHULAK: Is this email in the Salesforce notes? MALLET: No.")), despite Mallet's testimony the Salesforce Notes were "accurate[,]" (*id.* at 36:24–25 ("MR. MACHULAK: Do you believe that [the Salesforce Notes are] accurate? MALLET: Yes.")). Because of this inconsistency, the Court admitted some defense exhibits of email correspondences between the parties, labelling them Trial Exhibit D9, over Plaintiff's counsel's objection. (*Id.* at 39:1–4.)

system, Google Maps was "showing [the Facility] in a different spot" than its correct location on June 8, 2018, three weeks after the authorized opening date. (*Id.* at 63:4–64:6, 64:16–65:25.)

Additionally, Mallet detailed Defendants' payment obligations under the Agreement, stating they never paid the required recurring fees during the short time they operated under the Travelodge brand (*id.* at 24:22–25, 27:4–7), and that they signed the Guaranty confirming their obligations under the Agreement (*id.* at 26:16–24). Mallet further recounted how the franchise relationship ended, stating Huber Hotels relinquished the Facility after about one month of operation (*id.* at 24:12–19), at which time Travelodge issued a termination notice ("termination letter") demanding outstanding fees and liquidated damages (*id.* at 28:1–10).

### 2. Douglas Emann

Douglas Emann, Vice President of Financial Services for Wyndham, testified on April 8, 2025, primarily about the monetary aspects of the case, including the fees owed under the Agreement, the contents of the termination letter, and whether Defendants made any payments under the Agreement or termination letter. (Tr. at 101:6–133:22.) Emann was not originally listed as a witness in the pretrial report but was called as a substitute for a listed witness, another employee who had since left the company, and the Court allowed Emann to proceed. (*Id.* at 100:14–23.) Overall, the Court found Emann to be a credible witness and accorded his testimony commensurate weight.

Emann testified about the demand for payment that Travelodge made in the termination letter; specifically, he opined on the amounts of recurring fees and liquidated damages calculated as due from Huber Hotels (*id.* at 102:20–112:12) and stated Huber Hotels never paid any of the sums demanded (*id.* at 102:23–25). He explained the recurring fees were "[monthly] payments for the use of the systems, marks, [and] reservation system" (*id.* at 103:3–105:11; Trial Ex. P1 at 11–12), covering "marketing contribution[s], the daily guestroom charge, and the basis reservation fee" (Tr. at 104:9–10). As of April 4, 2025, Emann testified the recurring

fee balance owed to Travelodge was $102,106.97. (*Id.* at 108:19–20.) With respect to liquidated damages relating to "the loss of recurring fees for the early termination of the agreement" (*id.* at 110:3–6), Emann noted Travelodge is seeking $198,000, without principal, based on a calculation of $2,000 per room times 99 rooms in the Facility (*id.* at 110:18–111:10). The Agreement allows Travelodge to charge interest on outstanding liquidated damages. (*Id.* at 111:16–21.) Emann also testified the Agreement required Huber Hotels to report its revenue monthly (*id.* at 106:3–9), which it did not do (*id.* at 129:22–24).

On cross-examination, defense counsel questioned Emann about the accuracy of Travelodge's accounting process, highlighting a duplicate charge regarding a training program for the hotel's general manager (*id.* at 123:9–22), which plaintiff's counsel explained was an error Travelodge subsequently corrected in an updated itemized statement (*id.* at 123:23–124:23). Emann agreed with counsel's assessment and noted he corrected the error during trial preparation. (*Id.* at 125:17–23.) Defense counsel also probed whether the liquidated damages might be excessive given the short duration of the franchise, as well as the extent of the recurring fees (*id.* at 118:24–25), but Emann stood by the Agreement's formula of approximately $2,000 per room and the principle that liquidated damages serve to replace lost future earnings and are an appropriate measure of assessing Travelodge's damages (*id.* at 118:19–119:24). Emann also admitted that, despite never receiving monthly revenue reports from Huber Hotels, Travelodge did receive "nightly transmission data, . . . data that is actually transmitted from the property management system to us[,]" based on an estimate of the number of rooms rented. (*Id.* at 116:16–22, 117:5–19.)

### B. Defendants' Trial Witnesses

At the start of day two of trial, on April 9, 2025, defense counsel moved for a directed verdict (Tr. at 138:17–139:1), and plaintiff's counsel opposed and cross-moved for a directed

verdict in its favor (*id.* at 139:2–13). Court denied both motions, finding there was enough evidence in dispute to go forward with the trial. (*Id.* at 139:14–25.)

### 1. Robert Huber

Robert Huber testified in his own defense on April 9, 2025, and offered testimony relating to expectations for the hotel venture, renovations made to the Facility, and the real-time communications between the parties to underscore Defendants' understanding of progress and performance under the Agreement. (*Id.* at 141:21–207:5.) Overall, the Court found Mr. Huber to be a credible witness and accorded his testimony commensurate weight.

Mr. Huber recounted that he and Mrs. Huber decided to purchase the Snow Country Inn hotel (the Facility's prior operating name), the first hotel they had ever purchased as a real estate investment, after a broker in Milwaukee, Wisconsin made Mr. Huber aware of it. (*Id.* at 143:12–16.) Mr. Huber explained that, "[f]rom the very beginning [Mrs. Huber] and I have . . . thought the best approach was to look at some sort of franchise that would give us additional, a lot more exposure" because the Snow Country Inn "didn't have any nationwide exposure that we thought would come with Travelodge." (*Id.* at 143:20–144:2.) He testified that Defendants had their initial franchising conversation with a Travelodge Sales Representative, Ryan Fischer ("Fischer"), in September 2017, which preceded Defendants' purchase of the Facility on October 12, 2017, and that he and Mrs. Huber did not consider other franchisors because "[o]nce we talked to [Travelodge] we believed that was the best shot." (*Id.* at 144:3–23.) Mr. Huber stated Fischer completed an inspection of the Snow Country Inn before Mr. and Mrs. Huber finalized their purchase of the Facility, from which Travelodge generated a property improvement plan report on September 28, 2017. (*Id.* at 145:5–16.) He described being "really intrigued" by Fischer's statements that "Travelodge had between 23 and 25 million hits a year on the[] whole" and that "Wyndham has extremely devoted people to their rewards system[, which is] . . . second to none[,]" as well as by the roughly 600 page booklet specifying the

13

"business assets or angles of Wyndham" that Fischer brought on a visit to Mr. Huber's home in mid-October 2017. (*Id.* at 146:17–147:1, 147:16–23.) Fischer told Mr. Huber he believed it was "pretty realistic" that the Facility could open as a Travelodge hotel by the end of December 2017. (*Id.* at 148:5–6.) At their home on November 12, 2017, Mr. and Mrs. Huber signed the Agreement with Travelodge and shortly thereafter began remodeling the Facility based on Fischer's communications "of what we should be addressing." (*Id.* at 148:20–149:24.)

Mr. Huber testified that among Defendants' refurbishments of the Facility were new carpets throughout, a new lobby reception area including new lobby furniture, a new bar area, several new fireplaces, many new mattresses and bed linens as well as refrigerators, microwaves, and televisions for the guest rooms, of which several were handicap accessible. (*Id.* at 150:3–16, 153:9–10.) Mr. Huber noted all refurbishments were completed by the end of December 2017 apart from the bar, which was completed in either March or April 2018 due to delays obtaining the required liquor license. (*Id.* at 153:11–12, 154:6–11.) He further testified that from the time the Snow Country Inn was purchased through Christmas of 2017, Huber Hotels employed three people to work at the front desk, one of which was Panek as General Manager, plus several people to do housekeeping work and a full-time maintenance person. (*Id.* at 154:23–155:14.) With the expected opening date of January 29, 2018, fast approaching (*id.* at 156:1–2), Mr. Huber testified that on or about January 15, 2018, Katy Hebert ("Hebert"), another Wyndham representative, contacted him and Mrs. Huber and told them Travelodge's IT personnel would not be able to install the appropriate version of SynXis software but would visit the Facility at 9:00 A.M. on January 25, 2018, to install "a downgraded model . . . as something temporary to get us into, you know, get us open by January 29th." (*Id.* at 156:14–157:10.) However, according to Mr. Huber, "nobody showed up or did anything[,]" and Hebert told them they were rescheduling the installation to mid-March 2018. (*Id.* at 157:17, 158:16–20.) Mr. Huber stated he "thought that [they] were ready to go" with the hotel's opening as a

Travelodge on January 29, 2018 (*id.* at 158:7–10), and "wasn't real happy about [the rescheduled installation]" delaying the opening (*id.* at 158:22).

Mr. Huber further detailed what he viewed as a sudden demand to install a new phone system, testifying that Pocci "started asking things" around February 1, 2018, most notably "do you have all your phones . . . that [are] just directed for 911[emergency calls,]" to which he recalled replying, "I just don't recall ever talking about the phones . . . how do I go about this?" (*Id.* at 159:12–160:1.) He emphasized that from January 2, 2018, when he and Pocci began communicating about the punch list items, to around February 1, 2018, the requirement of obtaining a new phone system was never mentioned, stating:

> She would have the list in front of her. I had the list in front of me. And we would check things off. And she would say, Okay, you need to do this and this. I'd said, Okay, that's gonna be no problem. And then once we had, [sic] seemed like we got through the punch list, that's when she threw out the thing about the phones, but it hadn't come up in discussion.

(*Id.* at 160:10–19.) Defense counsel elicited testimony on direct examination suggesting the punch list merely required replacing the phone face plates, but Pocci's communication around February unexpectedly instructed Defendants to replace the phones entirely. (*Id.* at 160:25–161:3.)

Mr. Huber similarly described the manager training course for Panek as a new requirement introduced by Pocci "sometime in February," of which Defendants were not previously aware. (*Id.* at 161:19–21.) Mr. Huber stated the course as very costly, as it involved airfare and hotel for Panek to attend the "seven-night, eight-day class[.]" (*Id.* at 162:3–6, 11–21.) According to Mr. Huber, once the phone system was in place and as the adjusted March 15, 2018 opening date approached, Pocci told Mr. Huber he needed to buy art: "[A] minimum of one picture you have to have . . . behind the register so that when somebody walks in, it's a picture of people traveling and that is required to open[.]" (*Id.* at 163:10–13.) Mr. Huber remarked the art piece took two weeks to arrive and cost $79. (*Id.* at 163:15–17.) He recalled

Pocci telling him, "[I]t's in [the punch list] there. It talks about art and you got to have it up there," but that Mr. Huber "wasn't happy" and contacted someone at Travelodge, stating:

> I contacted, I don't know if I contacted [Fischer] but I contacted somebody and I said, You know, this [Pocci] is just, she's just – you know, if she would have just told us some of this stuff in the beginning we could have done it. But every time we get close to getting done, here comes another thing out of the blue.

(*Id.* at 163:22–164:2.)

On May 14, 2018, not long after Mr. Huber expressed his frustration with Pocci, he received the email from Hanson expressing regret for the "heartache" he and Mrs. Huber experienced in their communications about opening requirements with Pocci, which Mr. Huber took to mean Pocci had been replaced at Wyndham. (*Id.* at 164:3–165:15; Trial Ex. P14 at 1.) Then, without any forewarning, "[Mrs. Huber] was going back and forth with the IT department, and then we got an email, I think it was on the 15th of May, kind of came out of nowhere and it said you're now open. And we were tickled pink." (*Id.* at 167:18–22.)

Mr. Huber testified that, when the Facility was cleared to open as a Travelodge hotel on May 15, 2018, Defendants lacked sizeable posters, banners, or other signage and had almost no online visibility. *(Id.* at 168:2–172:16.) Mr. Huber stated he was told by Travelodge to buy a sign and pole from a Travelodge vendor for $38,000 to use, and Travelodge provided only a "three-feet-by-three-feet thing" to serve as a welcome banner. (*Id.* at 168:2–8, 168:20–169:3.) At the time of the opening, Mr. Huber described that the Travelodge website listed a single picture of the front of the Facility, an incorrect address that indicated the Facility was three miles away from its actual location, and an incorrect telephone number. (*Id.* at 172:17–173:4.) Mr. Huber also testified that a Travelodge representative seemingly apologized that the Facility was being overlooked by the company in favor of franchisees with multiple properties:

> I got to apologize. Right now we're going through some big changes throughout our whole Wyndham structure. And he said, I know it's not fair but, you know, it's motels like yours that are getting put at the bottom. And we've been dealing with the hotels

> more that have like 20, 30, 40 hotels. But we're gonna get it
> taken care of for you and we apologize for that.

(*Id.* at 169:25–170:6.) He continued that by June 10, 2018, the Facility had received only a few

bookings each day ("[m]aybe 20, 25 reservations" in total (*id.* at 176:25)), and very little

revenue as a Travelodge, amounting to virtually no "substantial bump at all" (*id.* at 173:8–20).

Ultimately, he and Mrs. Huber decided to sell the Facility back to its original owner, stating:

"I just couldn't afford it any longer. The hotel was running about 30,000 [dollars] a month, and

I just don't know when, when the relief was coming, and I just didn't have the money to keep

it going" (*id.* at 175:1–8) and "we had higher . . . expectations than what happened. And by the

time, like I said June 10th came around, we just, we couldn't afford to wait it out with them

any longer" (*id.* at 177:6–9). Mr. Huber stated he hoped the Facility could continue as a

Travelodge under the Agreement after the sale. (*Id.* at 176:4–13.)

On cross-examination, plaintiff's counsel challenged Mr. Huber's assertions and

characterizations about the hotel opening process, eliciting testimony from Mr. Huber that the

hotel refurbishments, some of which were not required by the punch list improved the property

value. (*Id.* at 180:6–8, 180:14–15 ("<u>MR. COUCH [Plaintiff's Counsel]</u>: Was the bar required

by the property improvement plan? <u>Mr. Huber</u>: No.").) Despite admitting he had received and

signed the FDD, which Plaintiff's counsel suggested clearly listed the phone requirements, as

well as an acknowledgement of Wyndham's policy requiring phone systems capable of dialing

911 in all rooms (*id.* at 183:3–19; Trial Ex. P21 at 1), Mr. Huber stated he "was depending on

the [punch] list and [Pocci] as we were going" (*id.* at 182:4–7). Mr. Huber also admitted that

Hebert sent him an email dated January 19, 2018, giving him advance notice the SynXis

training and installation would be postponed due to a scheduling issue. (*Id.* at 184:8–18.)

In response to questions probing Mr. and Mrs. Huber's communications with

Travelodge regarding their position on postponing the opening date, Mr. Huber insisted, "I

never made the request to bump the date until May 1[5]th[.]" (*Id.* at 190:20–21.) Mr. Huber

17

noted he often communicated with Pocci and others via telephone, because "I'm 100 percent computer-illiterate so everything I do is by phone quite often. And, you know, there's not a real trail then of paperwork that follows me" (*id.* at 190:23–191:1) and stressed "I would have [responded] by phone so it's not documented" (*id.* at 192:18–21). Further testimony on cross-examination revealed that Travelodge personnel acknowledged the arduous opening process. Plaintiff's counsel showed Mr. Huber an email in which Pocci stated, "I'm more than happy to move your opening date to better suit your needs. I think that May is a great time for a new beginning[,]" but the immediately preceding sentence in the email stated, "I am so sorry that the experience with this hotel has met with such unforeseen complications and we do certainly understand your decision." (*Id.* at 191:12–192:13; *see* Trial Ex. P10 at THI 00679.) Mr. Huber also conceded some documents in the record suggest he decided to relinquish control of the hotel either in late May or on June 10, 2018, noting again the hotel was costing him $30,000 per month and that he made no payments to Travelodge. (Tr. at 198:4–14, 200:19–201:3.)

On re-direct, Mr. Huber clarified the acknowledgment regarding the phone system policy raised in cross-examination did not clearly require a new phone system be installed before opening but only that the form "be returned before opening[.]" (*Id.* at 202:2–9; *see* Trial Ex. P21.) He further stated he "rel[ied] on [Travelodge representatives] to understand what would be required to open the hotel" even before he signed the Agreement or purchased the hotel. (*Id.* at 202:14–20.) Mr. Huber also disputed plaintiff's counsel's characterization of the series of events surrounding the SynXis training and installation scheduled for January 25, 2018, testifying he did not understand the email to "tell [him] that nobody was coming" because he expected to be able to proceed with the "reduced system[,]" and stating "there were followup [sic] calls as to what had happened on the morning of January 25th[.]" (*Id.* at 203:3–16.) Additionally, Mr. Huber pushed back against plaintiff's counsel's suggestion that his March 6, 2018 email to Pocci was a threat to shut the Facility down, insisting instead "[i]t was just to let

18

them know we're out there and we need some help[,]" and that he intended to continue to open up as a Travelodge hotel. (*Id.* at 204:2–3, 204:11–13; Trial Ex. P10 at 701.) Mr. Huber contended he and his staff made every effort to satisfy the requirements to open as they were communicated to him. (*Id.* at 204:11–205:9.) And Mr. Huber stated he and Mrs. Huber made the decision to sell the Facility on June 10, 2018, after the errors on the Travelodge website listing remained uncorrected:

> I think it was on June 10th that the website still had not been corrected. And at that point, you know, we had to cut our losses. I just didn't see – we were looking at like July now before we could even start getting revenue in off the website. And that's if it got corrected sometime in June. And I just didn't have the money to keep on going.

(*Id.* at 206:2–21.) Finally, Mr. Huber testified Travelodge did not give him or the purchaser of the Facility an opportunity to cure the alleged breach before terminating the Agreement. (*Id.* at 206:22–25.) Plaintiff's counsel did not pursue further questioning on re-cross, and Mr. Huber was excused. (*Id.* at 207:3–5.) The trial concluded shortly thereafter.

### 2.  Janette Huber (*De Bene Esse*)

On July 31, 2024, a *de bene esse* deposition of Mrs. Huber was held in Milwaukee, Wisconsin. (Huber Dep. 4:9–11.)[6] Mrs. Huber's testimony concerned the projects she undertook with Mr. Huber and Travelodge to open the Facility. (*Id.* at 15:8–9.) Overall, the Court found Mrs. Huber to be a credible witness and accorded her testimony commensurate weight.

Before explaining these projects, Mrs. Huber discussed the Guaranty she and Mr. Huber were asked by Travelodge to sign. (*Id.* at 11:25–12:1.) She explained her intention was to sign as Huber Hotels and not in her personal capacity.[7] (*Id.* at 13:6–13.) Once the Hubers signed

---

[6] The transcript of Mrs. Huber's deposition was submitted directly to the Court.

[7] On January 5, 2022, the Court issued an opinion on Defendants' summary judgment motion to dismiss claims against them personally, and specifically on whether the Guaranty is

the Guaranty, they sent a check for the franchise fee in the amount of $11,000 that Travelodge

cashed and never repaid. (*Id.* at 14:22–15:1, 43:1–3.)

Mrs. Huber testified her main project in preparing the Facility to open was "basically

ordering everything for the hotel[]," including mattresses, linens, and pillows. (*Id.* at 15:9–10.)

She and Mr. Huber worked through the punch list Travelodge provided of tasks to complete

prior to the Facility opening, including ones that needed to be completed after opening, stating

they "probably had it all done by January." (*Id.* at 15:24–16:4.) Mrs. Huber recounted:

> The building needed to be thoroughly cleaned, which was done.
> Everything needed to be up to Travelodge's standards, which was
> the bedding, the rooms, the telephones needed to be upgraded,
> which we found out later. You know, different – but anything on
> this list is what was completed. There was a breakfast area that we
> completed that needed to be done. The door locks, a lot of that
> needed to be repaired. There were some signs that needed to go
> up. So basically, the comfort of the room, that needed to be done.
> Coffee makers, we had to buy irons and ironing boards.

(*Id.* at 16:10–19.)

The first time Mrs. Huber began working with Pocci was to ask whether there was an

internal Travelodge website from which she could purchase hotel necessities but was met with

delayed answers and decided to order the needed items through Amazon instead. (*Id.* at 18:6–

15.) Mrs. Huber testified she "never could get quite an answer [from Pocci about the progress

towards opening], and it was – it was just difficult." (*Id.* at 18:15–17.) Later, when Defendants

believed they had completed everything on the punch list, Pocci informed them all the phones

in the guestrooms needed to be replaced so that 911 could be called directly. (*Id.* at 17:18–21.)

Mrs. Huber testified that the phone replacement was "quite a project that [Pocci] put us into,

you know, at a later time[,]" and it delayed the opening process. (*Id.* at 18:25, 19:13–14.) Mrs.

---

enforceable against them, finding the terms of the Guaranty "are clear and unambiguous," Mr.
and Mrs. Huber "were aware the Guaranty was to personally bind them," and that they "did
not modify, remove, or replace the language in the personal Guaranty in any way." The Court
therefore denied the motion on this issue. (*See* ECF No. 43 at 12–14.)

Huber insisted "there were just things that would come up that were not on the list that we had to get done . . . per [Pocci]." (*Id.* at 19:15–18.)

As the phones were being installed, Mrs. Huber stated she was uncertain about Travelodge's promises and duties toward the Facility. (*Id.* at 20:10–13.) Because communications with Pocci were "confusing" and "would [take] up to a week sometimes," Mr. Huber advised Mrs. Huber to focus on completing the items on the punch list. (*Id.* at 20:13–19.) "[O]nce we had our checklist done," Mrs. Huber felt Pocci increased the number of projects Defendants needed to complete, including purchasing art. (*Id.* at 27:14–22.) Mrs. Huber stated she thought it was "such a silly thing" to focus on art as a requirement for opening but acquiesced because "we need[ed] to get open because we need[ed] the reservation system so that we can start making sales." (*Id.* at 27:23–25.) Overall, Mrs. Huber described the opening process as cumbersome because Pocci "was difficult to work with," and recalled thinking "[Pocci] [didn't] really kn[o]w how to help us to move forward[.]" (*Id.* at 24:1–8.)

According to Mrs. Huber, the Travelodge hotel reservation system was never installed as promised. (*Id.* at 21:9–15.) Because of this, she testified she and Mr. Huber only had the original Snow Country Inn reservation system to use for bookings. (*Id.* at 38:10.) The Travelodge system would have provided customers with a 1-800 number listed on the website to speak directly to a professional and make reservations. (*Id.* at 26:19–27:5.) Additionally, "there was nothing on the website directing [customers to] the correct location" of the Facility, and, because the address listed was incorrect, prospective customers "couldn't even find [it]." (*Id.* at 27:4–10.) Mrs. Huber contended the Travelodge website itself displayed no pictures of the Facility. (*Id.* at 35:23.) Mrs. Huber testified that, at a certain point, she and Mr. Huber "just had to stop, because there was too much money that – we just didn't have any left, you know, that you could just continue" into late May or early June of 2018. (*Id.* at 23:2–14.) Mrs. Huber testified she had a general impression, particularly given the repeated delays with the

reservation system installation, that Travelodge was prioritizing larger accounts with multiple properties. (*Id.* at 24:22–25:18.)

On cross-examination, Mrs. Huber admitted she had not read the Agreement until after her prior deposition on February 5, 2021. (*Id.* at 49:10–16.) As plaintiff's counsel compared various aspects of Mrs. Huber's prior deposition testimony to her statements at the *de bene esse* direct examination, she stated she did not recall some of the details concerning the day-to-day events of the opening process because she was not directly involved. (*Id.* at 57:21–66:18.) Plaintiff's counsel elicited her testimony that, although she had affirmed ceasing operation of the Facility constituted termination under the Agreement at her prior deposition, Mrs. Huber testified she felt "there was kind of, like, a gray area" (*id.* at 67:21), and that she "really wouldn't have thought that at that time" (*id.* at 66:24–67:3). Mrs. Huber also clarified she believed everything regarding the door locks had been completed, but that some "needed more hardware" and "were being replaced." (*Id.* at 69:17–70:311). On redirect, Mrs. Huber emphasized that in the two to three months after March 2018, "the checklist kept extending further and further," the Travelodge website listing for the Facility was not functioning properly, the SynXis system had not been installed, and customers were unable to find the Facility. (*Id.* at 82:23–83:6.) She testified she and Mr. Huber drafted an email conveying their frustrations to prompt Travelodge to "get it moving" and open the hotel (*id.* at 82:24–25, 84:3–4) because "those are big things, it's not little things. And for a single owner as [Mr. Huber] and I, that can really affect you. It's not something you can just ride through" (*id.* at 83:7–9).

### III. JURISDICTION

"Federal courts are courts of limited jurisdiction that may only hear a case if the constitution or a federal statute provides the court with jurisdiction." *Jackson v. Del. River & Bay Auth.*, 224 F. Supp. 2d 834, 841 (D.N.J. 2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "[I]n a diversity action, the plaintiff must state all parties'

citizenships such that the existence of complete diversity can be confirmed." *Chem. Leaman Tank Lines v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 222 n.13 (3d Cir. 1999) (citing 5 Wright & Miller § 1208, at 100 (2d ed. 1990)). Further, "[a] plaintiff asserting diversity jurisdiction bears the burden of demonstrating that the amount in controversy exceeds $75,000." *In re Paulsboro Derailment Cases*, 704 F. App'x 78, 84 (3d Cir. 2017) (citing *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016)). If a defendant challenges the sufficiency of the plaintiff's amount in controversy, "the plaintiff . . . must produce sufficient evidence to justify its claims." *Suber v. Kontinental Koaches, Inc.*, 104 F.3d 578, 583 (3d Cir. 1997). In determining whether the claim exceeds this threshold, courts must assess either, "the value of the rights being litigated," *Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir. 1993), or, "the value of the object of the litigation." *Hunt v. Wash. State Apple Advers. Comm'n*, 432 U.S. 333 (1977). Ordinarily, the amount in controversy must be equal or exceed $75,000. *Id.* at 84. In reviewing the complaint, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear *to a legal certainty* that the claim is really for less than the jurisdictional amount to justify dismissal." *Auto-Owners Ins. Co.*, 835 F.3d at 395 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283 (1938) (emphasis in original)).

Here, the Court has diversity jurisdiction over Travelodge's sole claim of breach of contract against Defendants. Travelodge is a citizen of Delaware, its state of incorporation, and New Jersey, its principal place of business. (ECF No. 1 ¶ 1.) Each of the Defendants is a citizen of Wisconsin, as Mr. and Mrs. Huber are citizens of Wisconsin and Huber Hotels takes on the citizenship of its members. (*Id.* ¶¶ 2, 3.) Therefore, there is complete diversity of the parties as Travelodge does not share a citizenship with any of the Defendants. Moreover, Travelodge's prayer for relief requests approximately $260,000, which exceeds the amount-in-controversy

requirement. (*Id.* ¶ 6.) Consequently, the Court properly exercises diversity jurisdiction over Travelodge's claim against Defendants.

## IV.    LEGAL STANDARD

"After conducting a nonjury trial, the Court may enter judgment on a claim or defense after a party has been fully heard on the issue." *Travelodge Hotels, Inc. v. Durga, LLC*, Civ. A. No. 15-8412, 2024 WL 4345051, at *5 (D.N.J. Sept. 30, 2024) (citing Fed. R. Civ. P. 52(c)); *see also Newborn Bros. Co. v. Albion Eng'g Co.*, Civ. No. 12-2999, 2023 WL 3645716, at *2 (D.N.J May 24, 2023)). "In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial." *Durga*, 2024 WL 4345051, at *5 (quoting *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010)). "In so doing, the Court does not 'view the evidence through a particular lens or draw inferences favorable to either party.'" *Id.* (quoting *EBC, Inc.*, 618 F.3d at 272). To enter judgment under Rule 52(c), the Court must make findings of fact and conclusions of law. *Id.*

## V.    CONCLUSIONS OF LAW[8]

Travelodge argues Defendants breached the Agreement when they executed a quit claim deed and sold the Facility to Bertelson. (ECF No. 110 ¶¶ 46–48.) Defendants do not dispute the sale of the Facility but insist they were excused from continuing to perform under the Agreement by Travelodge's failure to timely integrate the Facility into its central reservation system. (ECF No. 109 ¶¶ 25–27.)

In New Jersey, "[t]o establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v.*

---

[8] As determined in a prior opinion of the Court, this action will be governed by New Jersey state law pursuant to the valid and express terms of the choice of law provision found in Section 17.6.1 of the Agreement. (*See* ECF No. 43 at 9 n.2; *see also* ECF No. 1, Ex. A, at 24.)

*Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007); *Red Roof Franchising, LLC v. AA Hosp. Northshore, LLC*, 877 F. Supp. 2d 140, 149 (D.N.J. 2012) (establishing breach of contract in New Jersey requires proof of a valid contract, performance, breach, and damages). Moreover, "New Jersey courts recognize that a material breach by either party to a bilateral contract excuses the other party from rendering any further performance." *Travelodge Hotels, Inc. v. Elkins Motel Assocs.*, Civ. A. No. 03-799, 2005 WL 2656676, at *5 (D.N.J. Oct. 18, 2005); *see Nolan ex rel. Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990) ("When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement."); *Magnet Res., Inc. v. Summit MRI, Inc.*, 723 A.2d 976, 981 (N.J. Super. Ct. App. Div. 1998) ("It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance."). "Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages." *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992). Nevertheless, "[u]nder no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits." *Ramada Worldwide, Inc. v. Hotel of Grayling, Inc.*, Civ. A. No. 08-3845, 2010 WL 2674460, at *9 (D.N.J. June 30, 2010) (quoting *S&R Corp.*, 968 F.2d at 376).

For contracts involving "a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to 'defeat the purpose of the contract.'" *Magnet Res.*, 723 A.2d at 981 (citing *Medivox Prods., Inc. v. Hoffmann-La Roche, Inc.*, 256 A.2d 803, 809 (N.J. Super. Ct. Law Div. 1969)). In applying the test of materiality, "a court should evaluate 'the ratio quantitatively which the breach bears to the contract as a whole, and secondly the degree of probability or improbability that such a breach will be

repeated.'" *Id.* "Whether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." *Travelodge Hotels, Inc. v. Honeysuckle Enters.*, 357 F. Supp. 2d 788, 797 (D.N.J. 2005) (citing *Magnet Res.*, 723 A.2d at 981).

Here, the Court concludes Travelodge's failure to integrate the Facility into its central reservation system within a reasonable time constitutes a material breach of the Agreement, and such conduct relieved Defendants of their obligations under same. Pursuant to Section 3.4.1 of the Agreement, Huber Hotels was to "participate in System marketing programs, . . . the Reservation System, and guest loyalty programs." (ECF No. 1, Ex. A, at 3.) Section 4.2 of the Agreement provides, "[d]uring the Term, the Facility will participate in the Reservation System on an exclusive basis." (*Id.* at 9.) Contrary to these express terms, Travelodge did not integrate the Facility into the Travelodge reservation system for six months, and as result Mr. and Mrs. Huber found they "just didn't have the money to keep it going." (Tr. at 175:1–8.) Indeed, the parties agree Defendants purchased the Facility in October 2017 and the Agreement was executed in November 2017, but Travelodge did not implement the reservation system until May 2018, and the Hubers transferred ownership to the original owner in June 2018. (ECF Nos. 109 ¶¶ 8, 9, 20, 26; 110 ¶¶ 1, 7, 38, 46.) The Court therefore concludes Travelodge's failure to timely perform on its obligations—namely, its failure to integrate the Facility into the Travelodge reservation system until May 2018, six months after the Agreement was executed—constituted a material breach of the Agreement. *See, e.g.*, *Elkins Motel Assocs.*, 2005 WL 2656676, at *5; *Lee Ho*, 577 A.2d at 146.

To the extent Travelodge's case rests on the argument that its delay in approving the Facility's opening as a Travelodge franchise was due to the presence of outstanding items on the punch list, the Court is unconvinced. (ECF No. 110 ¶ 39.) Undisputed trial testimony reveals Defendants immediately began remodeling the Facility after executing the Agreement based on Fischer's directions, the only Travelodge representative to visit the property. (Tr. at

148:20–149:24.) These refurbishments, which Mr. Huber testified were completed in either March or April 2018, included new carpets throughout the property, a new lobby reception area with new furniture, a new bar area, new fireplaces, and new mattresses, bed linens, televisions and appliances for guestrooms. (*Id.* at 150:3–16, 153:9–12.) Travelodge postponed the original appointment to install required software for integration into its reservation system from January 2018 until after Mr. and Mrs. Huber received a letter informing them the Facility was "live and selling effective today" on May 16, 2018. (*Id.* at 156:14–157:10; ECF Nos. 109 ¶¶ 15–16, 20; 110 ¶ 38.) Defendants were confronted with requirements for new telephone systems, manager training, and art from Travelodge between February and March 2018, which Mr. Huber testified would have been completed earlier had such requirements been clearly communicated. (*Id.* at 159:12–160:1, 162:3–6, 11–21, 163:4–164:2.) Finally, in May 2018, shortly after Mr. and Mrs. Huber received an email from Hanson expressing regret for the "heartache" they had endured as a result of the stalled opening process, they were notified they were finally integrated into the reservation system and could begin receiving reservations as a Travelodge hotel, albeit with few avenues to advertise the Facility and hundreds of thousands of dollars in costs already incurred. (*Id.* at 164:3–165:15, 167:18–22.)

The record is replete with evidence showing Mr. and Mrs. Huber timely complied with instructions from Travelodge representatives regarding opening requirements but were met with ever-moving goalposts. (ECF No. 109 ¶¶ 13–17, 22–24.) Specifically, the Court finds that two statements made during trial strongly suggest at least some of the Travelodge representatives in contact with Mr. and Mrs. Huber may have either de-emphasized some punch list items or affirmatively exempted Defendants from their completion. First, Travelodge's first witness, Mallet—who testified based solely on her pre-trial review of Defendants' file with Travelodge and without ever speaking with Defendants or participating in the opening process, and was the only one of Travelodge's witnesses to testify about the

substance of the Agreement—clearly stated franchisees may be permitted to open without 100% completion of punch list items and that "decisions can be made based on what's submitted as completed." (Tr. at 59:7–22.) Second, Mr. Huber stated throughout his testimony that he often communicated with Travelodge representatives by telephone such that a full record of communications, which may further bolster Mr. Huber's position that listed "requirements" were waived or otherwise de-emphasized, is unavailable. (*Id.* at 190:23–192:21, 203:3–16.) The Court deems these statements, along with other testimony, illustrate Defendants made sincere and substantial attempts to perform under the Agreement and comply with Travelodge's evolving expectations for six months after entering into the Agreement without any real ability to earn revenue as a Travelodge franchise, given the Facility was not provided access to the Travelodge reservation system.

Travelodge's failure to integrate the hotel into its reservation system—coupled with the evidence of inconsistent and confusing communications from at least four different Wyndham and/or Travelodge representatives across multiple offices and divisions (Tr. at 148:20–149:24, 156:14–157:10, 160:10–161:3, 164:3–165:15, 167:18–22) and the inaccuracies in the Facility's listing on the Travelodge website (*id.* at 172:17–173:4)—prevented Defendants from conducting a prompt and profitable opening as a Travelodge hotel. Mr. and Mrs. Huber were individual investors working alone on a first-time hotel venture, not sophisticated hoteliers with deep pockets handling many complex and high-value portfolios, yet Travelodge seeks to hold them to a dense 500-page contract whose requirements its own actions ensured could not be timely met, and whose supposed "requirements" may not, in fact, have been required. Consequently, the Court concludes Travelodge's breach was material and excused Defendants from further performance under the Agreement, including but not limited to their obligations to pay liquidated damages and recurring fees.

Accordingly, the Court finds in favor of Defendants.

## VI.    CONCLUSION

For the reasons set forth above and for good cause having been shown, the Court finds in favor of Defendants. An appropriate final judgment and order follow.


Dated: August 15, 2025                              */s/ Brian R. Martinotti*
                                                    **HON. BRIAN R. MARTINOTTI**
                                                    **UNITED STATES DISTRICT JUDGE**